UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:04CV-216-J

GLENDA N. CRAVENS                                                                                         PLAINTIFF

v.

JO ANNE BARNHART,
Commissioner of Social Security                                                                      DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court upon review of the Commissioner's objections to Magistrate Judge King's Report and Recommendation that plaintiff Glenda Craven's Social Security application for Title II benefits be remanded for payment. After conducting a de novo review of the Commissioner's specific written objections, the Court hereby adopts the Magistrate's report, and remands this action to the Commission for calculation and payment of benefits.

Ms. Cravens filed her application for benefits on November 19, 2002 alleging that she became disabled on November 8, 1999 as a result of a damaged heart and open heart surgery to replace a valve, secondary to childhood rheumatic fever. Her application was denied at the initial stage and upon reconsideration. After a hearing on February 26, 2004, Administrative Law Judge Thomas Bryan found that Ms. Cravens' medical conditions, including a history of rheumatic fever resulting in valvular heart disease and replacement, hearing loss in the right ear, osteoarthritis of the hands, degenerative disc disease of the lumbar spine and hypertension are severe impairments, but do not meet or medically equal listed impairments. The ALJ found that Ms. Cravens could return to her previous work as an office clerk, receptionist, tax preparer, and accounting technician. Ms. Cravens appealed the adverse decision to the Appeals Council, which found no basis for review, and her appeal to this Court followed. In recommending remand for payment, the Magistrate's Report

and Recommendation relies in part upon previous remand decisions by this Court. The Commissioner timely filed written objections to the Magistrate report.

## STANDARD OF REVIEW

This Court's review of the Commissioner's findings is limited to determining whether they are supported by substantial evidence, 42 U.S.C. §405(g); Elam ex rel. Golay v. Commissioner, 348 F.3d 124, 125 (6th Cir. 2003) and whether the correct legal standards were applied, Landsaw v. Secretary of HHS, 803 F.2d 211, 213 (6th Cir. 1986). Where the Commissioner's decision is supported by substantial evidence, the reviewing court must affirm, Studaway v. Secretary of HHS, 815 F.2d 1074, 1076 (6th Cir. 1987). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, Kirk v. Secretary of HHS, 667 F.2d 524 (6th Cir. 1981); Jones v. Secretary, 945 F.2d 1365 (6th Cir. 1991).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight, Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the court even if the record might support a contrary conclusion, Smith v. Secretary of HHS, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts, Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). It is within the parameters of the substantial evidence rule that this Court addresses and rejects the Commissioner's objections.

## BACKGROUND

The medical evidence reflects that Ms. Cravens has been under the care of her general physician Dr. Michael Callaway since February 17, 1992. Dr. Callaway's records note a history of left mastectomy in 1989 (Tr. 195), rheumatic valve disease/aortic valve insufficiency (Tr. 194, 190),

degenerative joint disease vs rheumatic changes in the hands, with noted changes in the finger joints (Tr. 182, 187, 174), low back strain with degenerative disc disease at L5-S1 with vacuum disc phenomenon, disc space narrowing, and osteopenia (Tr. 194, 227), degenerative disc disease of cervical spine (Tr. 164), profound, acute hearing loss in right ear with dizziness (Tr. 147, 158, 214), uterine polyps (Tr. 186), osteoarthritis (Tr. 182) and fibrocystic breast disease (Tr. 178).

## **SPECIFIC OBJECTIONS BY THE COMMISSIONER**

The Commissioner first objects to the Magistrate's giving controlling weight to the treating physician, Dr. Callaway, as the Commissioner contends that his opinion was properly rejected as unsupported by medically acceptable clinical and diagnostic techniques and is inconsistent with the remainder of the evidence of record, citing 20 C.F.R. §404.1527, and Wilson v. Commissioner, 378 F.3d 541, 544 (6th Cir. 2004). The Commissioner relies heavily upon the records of treating cardiologist Dr. Robert Christenberry (whose records consist of three follow-up office visits following the heart valve replacement, each some 12 months apart[1]) and consultative examining physician, Dr. Charles Dawson (whose opinions are based upon a one-time consultative examination and review of scant medical records[2]).

The Commissioner states that the records of cardiologist Dr. Christenberry reflect that Ms. Cravens' aortic valve replacement surgery was successful and uses those records to support its position that she does not have a disabling cardiac impairment. The Commissioner notes the

---

[1] Dr. Christenberry's records consist of 9 pages and are found at Tr. 233-241. They reflect three annual follow-up visits following her prosthetic aortic valve surgery on November 17, 1999.

[2] Tr. 293-303. Apparently, Dr. Dawson was provided only limited medical records for review, as his report states in the REVIEW OF DOCUMENTATION portion as follows: "There are some office visits from her primary care physician, which indicate ongoing anticoagulation for her mechanical valve. Otherwise, there is no other data."

3

characterization that Ms. Cravens has had a "very good year" in Dr. Christenberry's records. Indeed, some derivation of that phrase is used in each of Dr. Christenberry's records (Tr. 233, 238, 240). Further review however indicates that the records explain that a "good year" means to Dr. Christenberry that cardiac history and evaluation is benign (Tr. 238, paragraph 3), and that the patient has not been hospitalized or suffered from dyspnea, chest pain, palpitations, syncope or other heart-related difficulties (Tr. 233, paragraph 4). Certainly, Ms. Cravens' profound, acute hearing loss is not included in Dr. Christenberry's "good year" analysis. It is clear that Dr. Christenberry's use of this phrase is limited to any hospitalizations or complications regarding her heart valve function only. A "good year" means to Dr. Christenberry that, "She is having nothing to suggest . . . ominous cardiac symptoms." (Tr. 240)

Contrary to the Commissioner's depiction, Dr. Christenberry's records reflect a progression in mitral valve regurgitation from trivial levels in November of 1999 (Tr. 240) increasing in severity to moderate or 2+ by October of 2002 (Tr. 233).[3] The diagnostic studies also reflect a recurrence of aortic insufficiency,[4] an enlarged atrium, and left bundle branch block (Tr. 233). The Commissioner states that Dr. Christenberry's treatment notes do not support Dr. Callaway's statement that plaintiff has a weak heart or a leaky valve (DN 15, p. 5, paragraph 1). However, Dr.

---

[3]Mitral valve regurgitation is a disorder in which the mitral valve, which separates the left upper chamber of the heart (atrium) from the left lower chamber (ventricle) does not close properly. This causes blood to leak (backflow or regurgitation) into the left atrium from the left ventricle during contraction of the heart. Symptoms include fatigue, exhaustion, light-headedness, cough, shortness of breath, excessive urination, Department of Health and Human Services, National Institutes of Health: www.nlm.nih.gov/medlineplus/ency/article/000176.

[4]Aortic insufficiency is a heart valve disease in which the aortic valve does not close tightly. This leads to backward flow of blood from the aorta into the left ventricle (the left lower chamber of the heart). Symptoms include heart palpitations, irregular pulse, fainting, weakness, particularly with activity, shortness of breath with activity or when lying down, fatigue, excessive tiredness, chest pain, Department of Health and Human Services, National Institutes of Health: www.nlm.nih.gov/medlineplus/ency/article/000179.

Christenberry's notes and Dr. Callaway's statements appear to be consistent to this Court. Dr. Christenberry's notes do show a worsening of her mitral valve regurgitation, which was once "trivial" to moderate at 2+. The records also reflect that though the aortic valve replacement surgery is considered successful, it has not eradicated the aortic insufficiency.

The Commissioner argues that the Magistrate Judge completely ignored Dr. Christenberry's notes and the fact that Dr. Christenberry is a specialist whose notes deserve a higher degree of deference than Dr. Callaway's as a general practitioner, citing 20 C.F.R. 404.1527(d)(5). In so arguing, the Commissioner emphasizes the fact that Ms. Cravens tries to walk regularly in her neighborhood, and attempts to use that fact to contradict Dr. Callaway's opinion that she is limited in her ability to walk for more than several minutes, and that she has limited stamina (Tr. 271). However, a review of the hearing transcript indicates that Ms. Cravens walks because it is a <u>prescribed</u> exercise for her (Tr. 41). The fact that she says she "tries" to walk would also suggest that the activity is difficult for her.

The Commissioner next argues that Dr. Callaway's opinions improperly make vocational statements that are outside his area of expertise and are more properly addressed by a vocational expert, particularly with regard to his opinion that she would have difficulty performing her past work because of the progressive arthritis in her hands (Tr. 271). This Court does not have the benefit of any vocational expert testimony, as one was not called at the hearing. However, it does note that the treatment records of Dr. Callaway indicate as early as 1995 that there are notable changes in the joints of Ms. Cravens' hands, and the ALJ's observations at the hearing are consistent with such changes, as the deformities in her hands were readily apparent.

The Commissioner relies heavily upon the one-time consultative examination by Dr. Dawson to support its premise that Dr. Callaway's opinions are unsupportable and inconsistent. However,

5

it should be noted that the ALJ did not accept the opinions of this consultative examiner who agreed with Dr. Callaway that Ms. Cravens is unable to perform even sedentary work on a full time basis (Tr. 299-302). Dr. Dawson's findings that plaintiff's impairments preclude her from sitting for six hours per eight hour workday are consistent with Dr. Callaway's finding that the plaintiff cannot "sit for more than several hours at a time," each of which would preclude full-time work. Dr. Dawson was unable to identify medical/clinical findings to support his conclusions (Tr. 300), perhaps because his examination was limited, and he did not have the benefit of Dr. Callaway's complete records, nor did he have any of Dr. Christenberry's records and test results (Tr. 295).

The Commissioner's argument is further unpersuasive in light of the general concepts of the treating physician rule. While the Court notes that both Dr. Christenberry and Dr. Callaway are treating physicians, it is also cognizant of the very limited scope of Dr. Christenberry's role in Ms. Cravens' care (limited to three follow-up visits) compared to that of Dr. Callaway, whose records go back some eleven plus years to February 17, 1992 (with at least thirty visits reflected in the case transcript). Dr. Callaway, though not a specialist, is in the unique position to comment on Ms. Cravens' overall decline in health over those eleven years. Dr. Callaway's records include his clinical observations over this time period, and show the progressive changes in Ms. Cravens' medical conditions which include her loss of hearing, degenerative changes in her cervical and lumbar spine, degenerative changes in the joints of her hands, as well as the increasing difficulties she is experiencing with heart-related fatigue. His records also include objective test results that are consistent with her physical complaints. His opportunity to observe the patient over an eleven-plus year period of time, and to see the gradual worsening of her overall condition is invaluable.

It has long been established that the special position occupied by a treating physician calls for his or her opinion to be accorded great weight. While the ALJ is not bound by the opinions of

6

a treating physician, he is required to set forth some basis for rejecting that opinion, Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987). There is no error in declining to accept the unsupported conclusory statement of a physician, even a treating physician, Hall v. Bowen, 837 F.2d 272 (6th Cir. 1988); Duncan v. Secretary, 801 F.2d 847 (6th Cir. 1986).

The underlying basis for according greater weight to the opinion of a treating physician is the fact that one who has seen a patient over a period of time is in a better position to evaluate complaints, related incidents to previous events, and note the waxing and waning of the disease process. This type of insight justifies greater reliance upon the opinion of a treating physician and is the type of insight that an expert reviewing only records or examining the patient on single or limited occasions simply cannot have. Given Dr. Christenberry's limited and isolated interaction with Ms. Cravens, and Dr. Callaway's comprehensive management of all of Ms. Cravens' conditions, it was error for the ALJ to reject Dr. Callaway's opinions. The reasons cited by the ALJ do not justify rejecting Dr. Callaway's opinion. When Dr. Callaway's opinion is accorded the weight to which it is entitled, the record as a whole does not support the decision of the Commissioner.

Additionally, in rejecting Dr. Callaway's evaluation and finding Ms. Cravens capable of performing her past work, the ALJ made several credibility findings that are not supported by substantial evidence. The medical evidence clearly and objectively shows that Ms. Cravens suffers from both aortic and mitral valve insufficiency in addition to degenerative disc disease of the cervical and lumbar spine, osteoarthritis and degenerative changes in the joints of her hands, and profound and acute hearing loss, in addition to having undergone a mastectomy as a result of breast cancer, conditions which could reasonably be expected to be the source of her disabling fatigue and symptoms. Nonetheless, the ALJ found that Dr. Callaway's opinion was not entitled to deference,

and that Ms. Cravens is capable of returning to her previous work. This is also contrary to the state agency physician Dr. Fernando Pajo finding that the "severity of alleged limitations from impairments considered credible" (Tr. 267).

Though generally entitled to great deference, an ALJ's credibility findings must nevertheless be supported by substantial evidence, Walters v. Commissioner, 127 F.3d 525, 531 (6th Cir. 1997). In rejecting Ms. Cravens' credibility so as to find her capable of returning to her previous work, the ALJ made erroneous findings that: 1) she adamantly refuses prescription medication in spite of elevated blood pressure; 2) her cardiac evaluations since surgery are normal, with exception of mitral regurgitation; 3) her complaints of fatigue are unsupported by any medical evidence, as is her complaint of inability sit, stand or walk for long periods; 4) she has no evidence of end organ damages as a result of hypertension; 5) Dr. Dawson's physical examination on April 24, 2004 was normal, and the joints in her hands appear normal despite having been diagnosed with arthritis; 6) her self-assessed abilities from the hearing to walk one mile, stand for 10 minutes and sit for 10-15 minutes are inconsistent with her report to Dr. Dawson wherein she indicated she could walk 30 to 40 minutes, sit 30 minutes, and stand 20 to 30 minutes.

With regard to Ms. Cravens' dislike of taking prescription medications, the ALJ erroneously suggests that she refuses to take high blood pressure medication. This finding is unsupported by the record, as she has been prescribed an ACE inhibitor, Vasotec by Dr. Christenberry. This is also noted on her medication list in the record at Tr. 126. The ALJ also erred in finding that the cardiac evaluations since her surgery are normal with the exception of moderate mitral valve regurgitation, which was not significant enough to warrant replacement. This statement fails to recognize the progressive nature of Ms. Cravens' mitral valve condition which at the time of surgery was considered "trivial" but has since increased in severity to "moderate." Also, this statement fails to

reflect her continuing problems with aortic insufficiency, left bundle branch block, and an enlarged left atrium, despite the surgery.

Next the ALJ finds that her complaints of fatigue are unsupported by any medical evidence, as are her complaints of inability sit, stand or walk for long periods. These findings assume that neither the aortic nor mitral valve conditions could cause difficulties with fatigue and problems sitting, standing and walking. Furthermore, the ALJ's statement does not take into account the diagnosis and treatment for degenerative disc disease and osteoarthritis. Next the ALJ finds that there is no evidence of end organ damage resulting from hypertension; however, the MRI performed on July 9, 2001 indicates white matter in the cerebral hemispheres, for which the differential diagnosis may include lacunar infarctions perhaps related to hypertension, demyelinating process, post inflammatory or post traumatic states (Tr. 215).

The ALJ next states that her physical examination by Dr. Dawson on April 24, 2004 was normal. This opinion is based in part upon the fact that Dr. Dawson found "no abnormal joints, especially the joints of the hands appear to be normal." (Tr. 295) However, this finding of Dr. Dawson is in direct contrast with Dr. Callaway's findings beginning as early as 1995 (Tr. 184) as well as the ALJ's own observations at the hearing wherein he states, "It looks like . . . you've got deformity in your fingers." (Tr. 49) The ALJ next finds that her self-assessed abilities to walk one mile, stand for 10 minutes and sit for 10-15 minutes are inconsistent with the report of Dr. Dawson wherein she indicated she could walk 30 to 40 minutes, sit 30 minutes, and stand 20 to 30 minutes. While it is true that these self-assessments differ somewhat, they differ by only 10 minutes estimated for standing, 15 minutes estimated for sitting, and the ability to walk one mile versus the ability to walk for 30 to 40 minutes. These minor differences are not on their face substantially inconsistent.

Finally, the Commissioner contends that the Magistrate improperly applied <u>Faucher v. Secretary</u>, 17 F.3d 171 (6th Cir. 1994) to award benefits in this case. After reviewing the record as a whole, and when the opinions of Dr. Callaway are accorded the weight to which they are entitled, it is clear to this Court that there are no remaining factual issues that would warrant remand for further proceedings. Ms. Cravens suffers from objectively verifiable, progressive diseases which render her incapable of performing any work, consistent with the residual functional capacity opinions of Dr. Callaway. This is one of the rare cases in which all essential factual issues have been resolved, and the overwhelming evidence entitles Ms. Cravens to benefits.

Where the record is fully developed, all essential factual issues have been resolved, and the record adequately establishes entitlement to benefits, remand for further proceedings serves no legitimate purpose, see for example <u>Abbott v. Sullivan</u>, 905 F.2d 918 (6th Cir. 1990). The Court finds that this is one of those rare cases in which "proof of disability is strong and evidence to the contrary is lacking," <u>Faucher v. Secretary</u>, 17 F.3d 171, 176 (6th Cir. 1994).

A Judgment in conformity with this Memorandum Opinion has this day been entered.